# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

―――――――――――

№ 16-CV-5119 (JFB)
―――――――――――

JAIRON GONZALES-MARTINEZ,

Petitioner,

VERSUS

MICHAEL KIRKPATRICK,

Respondent.

―――――――――――

**MEMORANDUM AND ORDER**
September 6, 2017
―――――――――――

JOSEPH F. BIANCO, District Judge:

Jairon Gonzales-Martinez (hereinafter "petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. Petitioner was convicted of murder in the second degree (N.Y. Penal Law § 125.25); attempted murder in the second degree (N.Y. Penal Law § 125.25, as modified by Penal Law § 100.05(3)); assault in the first degree (N.Y. Penal Law § 120.10(1)); gang assault in the first degree (N.Y. Penal Law § 120.07); and assault in the second degree (N.Y. Penal Law § 120.05(2)). Petitioner was sentenced to a period of incarceration of 20 years to life for the murder charge; a determinate, concurrent sentence of ten years' incarceration and five years' post-release supervision for the attempted murder, first-degree assault, and gang assault charges; and a determinate sentence of three years' incarceration and three years' post-release supervision for the second-degree assault charge. In sum, petitioner received a sentence of 33 years to life of imprisonment with five years' post-release supervision.

In the instant habeas petition ("Pet.," ECF No. 1), petitioner challenges his conviction and sentence, claiming that his constitutional rights were violated on the following grounds: (1) the trial court committed reversible error when it improvidently exercised its discretion by admitting into evidence autopsy photographs of the decedent when the defense did not contest the cause or time of death; (2) the trial court committed reversible error when it permitted a prosecution witness to testify that petitioner exchanged gang signs with other individuals without having established the proper

1

foundation for such testimony; (3) the prosecution failed to prove petitioner guilty beyond a reasonable doubt, and petitioner's conviction was against the weight of the evidence; and (4) petitioner's sentence, the aggregate of which was a period of imprisonment of 33 years to life, was harsh and excessive and should be modified in the interest of justice. (Pet. at 2.) For the reasons discussed below, petitioner's request for a writ of habeas corpus is denied in its entirety.

I. BACKGROUND

A. Facts

The following facts are adduced from the instant petition and underlying record.

On the night of June 4, 2011, petitioner and Abraham Orellana, both patrons of the Fiesta Pool Hall at 1219 Suffolk Avenue in Brentwood, had an argument that ended in Mr. Orellana's hospitalization. (T.[1] 922-936.) The argument began because of petitioner's and his friends' alleged membership in the MS-13 gang. (T. 1241.) Because petitioner's group and Mr. Orellana's group "shouldn't be in the same place," the argument ensued. (T.1250.) The argument became physical outside of the bar, and ended after someone struck Mr. Orellana in the head with a brick. (T. 1252; 1524-25.) At this point, petitioner and his friends fled, and Mr. Orellana was transported to a hospital. (T. 1253; 1525.) At the hospital, Mr. Orellana was treated for a laceration above his right eye, a mark on his nose, and a cut to his mouth, which medical records attributed to being struck in the head by a rock. (T. 1979.)

Approximately 15 minutes later, Jose Valasques, who witnessed the attack, was outside the bar calling for a cab when petitioner and a group of people walked towards the bar carrying bats and iron bars, yelling, "You want to die, you sons of bitches." (T. 1254, 1524-29.) At this point, Mr. Valasques reentered the bar, where Jorge Martinez, the bouncer and a witness to the attacks, closed the door to prevent both entry and exit. (T. 1258; 1529.)

Petitioner and his group continued their approach toward the Fiesta Pool Hall, where they surrounded Ramiro Garcia and Rumaldo Bethancourt-Lopez, who pleaded for the group to "not do anything to them, that they didn't want to have problems and not to kill them." (T.1537.) Petitioner and his cohorts then began striking Mr. Garcia and Mr. Bethancourt-Lopez in their heads with bats and pipes. (T. 1256.) The group also began kicking their victims. (T. 1257.) During the attack, the victims could be heard crying for help. (T. 1573.)

As the victims were on the ground, petitioner and his group went to the door of the establishment and demanded that Mr. Martinez come out; they then broke the bar's door and fled. (T. 1257.) Mr. Valasques identified petitioner as the individual responsible for jamming an iron bar about sixty inches in length into the door. (T. 1539.) After the group and petitioner fled, Mr. Martinez allowed the occupants to leave the pool hall, where he discovered that one victim, Mr. Garcia, was alive, while the other, Mr. Bethancourt-Lopez, lay dead. (T. 1259.)

At the time of the second attack, Suffolk County Police Officer Kenneth Meyerback

---

[1] Citations to "T." are references to the transcript of petitioner's April 2013 jury trial before the Honorable Mark Cohen.

was parked on the side of Suffolk Avenue near Willoughby Street when a lady in a car alerted him that "there [was] a fight going on at the bar back that way," at about 1:40 a.m. (T. 1049.) As Officer Meyerback approached the Fiesta Pool Hall, he saw several people outside and two Hispanic males running by him in a westbound direction toward Bergen Street. (T. 1051-1053.) One individual was in a white t-shirt, while petitioner was in a black t-shirt with a graphic design. (T. 1052.) Another woman told Officer Meyerback that "those two guys that are running, get them, they just beat somebody with a bat." (T. 1058.) Hearing this, Officer Meyerback then turned his car around in pursuit of the two individuals that he saw make a right onto Bergen Street. (T. 1060.)

After turning right onto Bergen Street and not seeing the fleeing individuals, Officer Meyerback then proceeded to Glenmore Avenue where he saw petitioner, in a dark shirt, running while looking over his shoulder. (T. 1060-61.) As Officer Meyerback turned left onto Glenmore Avenue, petitioner then ran into a backyard. (T. 1061.) Officer Meyerback followed petitioner into the backyard; however, upon not being able to see petitioner and hearing a dog barking in a neighboring yard, Officer Meyerback returned to his car and proceeded to Evergreen Street, which runs parallel to Glenmore Avenue. (T 1062-63.) While proceeding down Evergreen Street, petitioner darted out in front of Officer Meyerback's patrol car. (T. 1063.) At this point, Officer Meyerback chased petitioner on foot past two or three houses before tackling him and placing him under arrest. (T. 1064.)

While petitioner was in custody and sitting in the passenger seat of the police car, Officer Meyerback performed a quick weapons search and observed what appeared to be blood on petitioner's pants. (T. 1069-70.) Then, petitioner's phone began to ring, so Officer Meyerback took the phone, without opening or looking through it, into his possession until he transferred it to homicide detectives present at the Fiesta Pool Hall. (T. 1097-98.) Officer Meyerback then returned to Fiesta Pool Hall, with petitioner, "to find out what had happened at the pool hall and if [petitioner] had been involved." (T. 1071.)

At the pool hall, Mr. Martinez and Mr. Valasques both identified petitioner, who was sitting in the police car, as one of the assailants. (T. 1261-63, 1542.) Furthermore, Mr. Martinez identified petitioner by his nickname "Mapache," as well as two other assailants whom he had seen before and knew as "Sombra" and "Cuervo," but who were not present at the scene. (T. 1260, 1266.) Among the items recovered just outside of the door of the pool hall near the victims were three branches, a metal bar, two baseball bats, one pool cue, and two pool balls. (T. 1455-56.) Suffolk County Police Detective Timothy Kelly was unable to obtain fingerprints from any of the items. (T. 1457.)

Mr. Garcia, the survivor of the second attack, was taken by ambulance to Southside Hospital. (T. 922, 1692.) Mr. Garcia's injuries included lacerations and contusions to the face, fractures of the facial bones and skull, and contusions to the lungs, which resulted in Mr. Garcia's comatose state for a period of time. (T. 1982, 1694.) Accordingly, Mr. Garcia's medical records indicated that his injuries were consistent with being "struck with a baseball [sic] and pipe." (T. 1983.)

Mr. Bethancourt-Lopez, the decedent, had been injured so badly that his "face and head were beaten beyond recognition," according to Suffolk County Police Officer Michael Levy. (T. 967.) In fact, his autopsy

revealed that Mr. Bethancourt-Lopez suffered severe injuries to the face and scalp, and that these injuries were consistent with blunt impact injuries to the head. (T. 1909.) Besides abrasions and contusions, there were also fractures of the facial bones and skull, injuries to the brain, and lacerations to the scalp. (T. 1909.) Also, evidence of patterned contusions, which take the shape of the object used to create the injury, was present on the decedent's torso. (T. 1909.) The internal examination showed "blunt impact injuries of the internal organs, most markedly of the brain," which had contusions in multiple areas, and lacerations and hemorrhages in the brain's white matter, suggesting a widespread brain injury. (T. 1917.) Furthermore, fractures were discovered in cartilage of the neck along with contusions to the lungs and the testes. (T. 1917-18.)

Dr. Hajar Sims-Childs, the Deputy Medical Examiner who conducted Mr. Bethancourt-Lopez's autopsy, concluded that a "fracture of the face and skull would be caused by significant force." (T. 1918.) Dr. Sims-Childs further concluded that "blunt impact injury" to the head caused the victim's death, and that the injuries were consistent with being struck by baseball bats and a metal pipe. (T. 1918.) In fact, Dr. Sims-Childs found that the square metal pipe recovered outside of the pool hall was consistent with the rectangular patterned contusions found on Mr. Bethancourt-Lopez's chest. (T. 1941.) In addition, the baseball bats recovered were consistent with the injuries on Mr. Bethancourt-Lopez's left arm. (T. 1942.)

Surveillance video was unrecoverable from the Fiesta Pool Hall; however, video was recovered from the El Salvador Deli and Precision Driving School, both of which are located west of the pool hall. (T. 1185, 1186, 1193.) Although none of the camera angles showed the actual attack, several angles captured petitioner and his cohorts both before and after the two attacks. (T. 1721-79; 1175.) In one video from the deli taken hours before the attack, Suffolk County Police Detective John McLeer identified petitioner, also known as "Mapache," in a dark shirt; along with Jeovani Guzman-Hernandez, also known as "Sombra," in a white shirt; and Walter Cruz, also known as "Cuervo," in a white shirt. (T. 1721-27.) In this same video, Detective McLeer said that all three individuals were "throwing signs," or gang signals. (T. 1745-46.)

The recovered surveillance video timestamped immediately after the first assault of Mr. Orellana showed petitioner and his friends leaving the area and, as petitioner was walking away, petitioner dropping an object to the ground. (T. 1766.) About 15 minutes later, petitioner and two other men approached the Fiesta Pool Hall, each holding objects presumed to be weapons, such as a long metal bar. (T. 1779, 2445.) After the murder, at least five individuals could be seen running away, immediately followed by a police car: two individuals first, followed by another two individuals, and then petitioner, immediately followed by Officer Meyerback's police car, which turned left onto Glenmore Avenue. (T. 1780-81.)

A warrant was obtained to recover data from petitioner's cell phone. (T. 1699, 1703.) An analysis of petitioner's cell phone, which was immediately recovered by Officer Meyerback, showed calls were made to Guzman-Hernandez's phone on June 4, 2011 at 3:26 p.m. (T. 2025.) Furthermore, incoming calls from Guzman-Hernandez's phone to petitioner's were answered as late as 1:37 a.m. on June 5, 2011. (T. 2027.) Thirteen unanswered calls from four numbers, including Guzman-Hernandez's number, were also present in the missed calls log of petitioner's phone, some of which were

timestamped immediately preceding the murder. (T. 2027-30, 2448.) Indeed, Guzman-Hernandez's number was in petitioner's contacts under the name "Sobar." (T. 2031.)

An analysis of Guzman-Hernandez's phone revealed that calls were made to his phone from petitioner's phone on several occasions. (T. 2033.) Specifically, petitioner's number under the name "Mapache" could be found in his outgoing calls log. (T. 2034.)

DNA testing of Mr. Bethancourt-Lopez's clothing revealed blood on a boot matching Mr. Garcia's DNA profile. (T. 2099.) In addition, blood on Mr. Garcia's shoe matched Mr. Bethancourt-Lopez's profile. (T. 2102.) A red metal bat recovered at the scene had blood matching Mr. Garcia's profile. (T. 2103.) Further, the handle of that same bat had blood matching Mr. Bethancourt-Lopez's profile (T. 2104), and the metal pipe had blood that matched Mr. Garcia's profile (T. 2104). The other bat recovered, a Louiseville Slugger, had blood on the barrel and handle that matched Mr. Bethancourt-Lopez's profile. (T. 2105.) Of two sticks recovered at the scene, one had both victims' DNA profiles, while the other had just Mr. Garcia's profile. (T. 2105-2106.)

DNA testing of petitioner's clothes showed that both victims' blood was present. (T. 2106-2111.) Specifically, a bloodstain on petitioner's shoe matched that of Mr. Garcia's profile. (T. 2107-08.) Moreover, the blood found on petitioner's jeans matched that of the decedent's profile. (T. 2106.) Regarding the samples that matched Mr. Bethancourt-Lopez's DNA, the probability of a randomly selected, unrelated individual having a DNA profile matching that of the blood stains are one in 523 quintillion. (T. 2109.) As for the samples that matched Mr. Garcia's DNA, the probability of a randomly selected, unrelated individual having a DNA profile matching that of the stains are one in 2.15 quintillion. (T. 2111.)

Along with the DNA analysis, the stains found on petitioner's clothing revealed bloodstain patterns on the black jeans and each sneaker, but not the t-shirt. (T. 2249-50.) The stains found on the t-shirt appeared to be blood, but no connection to the victims was detected. (T. 2250.) However, petitioner's jeans had three bloodstains that were classified as impact spatter patterns, as were the bloodstains on his shoes. (T. 2251.) The forensics analysis concluded that the person wearing these clothes had to be in close proximity to the blood's source, *i.e.*, the victim. (T. 2257.) Because of the way the blood was dispersed, there were impact spatter stains on a car and the door of the pool hall, while cast off patterned stains were present on the awning over the door. (T. 2277, 2281.)

At trial, the prosecution moved to admit autopsy photographs of Mr. Bethancourt-Lopez into evidence. (T. 1922.) Upon viewing the photographs, defense counsel objected to three of them, arguing the photographs were prejudicial because "the medical examiner already indicated what the injuries" were and that the defense was not contesting the cause of death. (T. 1923-24; 1928-29.) Exhibit 90, which was a picture of Mr. Bethancourt-Lopez's face after the attack, and exhibit 96, which was a picture of Mr. Bethancourt-Lopez's removed lung, were admitted because they tended to prove the "material or disputed issue" of intent and helped the medical examiner's explanation of the decedent's autopsy, and were not "offered for the sole purpose of arousing the emotions of the jury." (T. 1934-37.) However, exhibit 92, which was a close-up photograph of lacerations to Mr. Bethancourt-Lopez's scalp

5

already depicted in another photograph, was not admitted into evidence. (T. 1934.)

Also at trial, in addition to his recounting the events of June 5, 2011, Mr. Martinez testified that he had heard petitioner and his friends claim they were part of the MS-13 gang. (T. 1241.) Additionally, Mr. Martinez testified that he observed petitioner and his friends making MS-13 gang signs. (T. 1238, 1242.) After the defense objected, the trial court held that it would admit Mr. Martinez's testimony into evidence, with a limiting instruction regarding petitioner's alleged gang membership. (T. 1228-1234.)

B. Procedural History

On April 18, 2013, a jury convicted petitioner in the Supreme Court of Suffolk County of the following: assault in the second degree, gang assault in the first degree, assault in the first degree, attempted murder in the second degree, and murder in the second gegree. (T. 2614-17.) On May 22, 2013, petitioner was sentenced to an aggregate sentence of 33 years to life of incarceration with five years' post-release supervision. (S.[2] 15-18.)

After sentencing, petitioner appealed his conviction and sentence to the Appellate Division, Second Department and raised the following challenges: (1) the trial court improperly admitted autopsy photographs into evidence; (2) testimony regarding petitioner's membership in a gang deprived him of a fair trial; (3) his guilt was not proven beyond a reasonable doubt and the jury's verdict was against the weight of the evidence; and (4) the sentence imposed was harsh and excessive.

On February 3, 2016, the Appellate Division, Second Department affirmed petitioner's judgement of conviction. *See People v. Gonzales-Martinez*, 136 A.D.3d 651 (N.Y. App. Div. 2016). In its opinion, the Second Department held that "the legal sufficiency of the evidence [was] mostly unpreserved for appellate review." *Id.* at 651. Nevertheless, in viewing the evidence in the light most favorable to the prosecution, the Second Department found there was enough evidence to find petitioner guilty beyond a reasonable doubt. *Id.* Moreover, the Second Department conducted an independent review of the record and determined that petitioner's conviction was not against the weight of the evidence. *Id.* It also held that the trial court did not err in allowing testimony regarding petitioner's gang affiliation because the probative value of that testimony outweighed any prejudice. *See id.* at 652. Specifically, the court held that "the testimony was relevant to the issue of [petitioner's] motive, was inextricably interwoven into the narrative, and explained the relationships between the parties." *Id.* In fact, the Second Department found that the trial court providently reduced any possible prejudice by "providing appropriate limiting instructions." *Id.* Finally, the Second Department held that petitioner's remaining, unaddressed claims were without merit; this included the claims about the admitted autopsy photographs and petitioner's sentence. *Id.*

On April 29, 2016, petitioner's conviction became final when the New York Court of Appeals denied petitioner's application for leave to appeal. *See People v. Gonzales-Martinez*, 27 N.Y.3d 997 (2016).

---

[2] Citations to "S." are references to the transcript of petitioner's May 2013 sentencing before the Honorable Mark Cohen.

C. The Instant Petition

On September 8, 2016, petitioner moved before this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on the following grounds: (1) the trial court committed reversible error when it improvidently exercised its discretion by admitting into evidence autopsy photographs of the decedent when the defense did not contest the cause or time of death; (2) the trial court committed reversible error when it permitted a prosecution witness to testify that petitioner exchanged gang signs with other individuals without having established the proper foundation for such testimony; (3) the prosecution failed to prove petitioner guilty beyond a reasonable doubt and the jury verdict was against the weight of the evidence; and (4) petitioner's sentence, the aggregate of which was a period of imprisonment of 33 years to life, was harsh and excessive and should be modified in the interest of justice. (Pet. at 2.) Respondent filed a memorandum of law opposing petitioner's application on October 19, 2016. (ECF No. 6.)

The Court has fully considered the parties' submissions.

II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented by the State court proceedings.

28 U.S.C. § 2554. "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principles from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment

7

that the relevant state-court decisions applied clearly established federal law erroneously or incorrectly. Rather, that application must be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed feelings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

III. DISCUSSION

As set forth below, the Court concludes that each of petitioner's challenges to his conviction and sentence is without merit and, accordingly, denies his petition for a writ of habeas corpus in its entirety.

A. Petitioner's Evidentiary Challenges

Petitioner raises two arguments that the trial court erroneously admitted certain evidence and testimony at trial. First, he contends that the trial court committed reversible error when it exercised its discretion by admitting into evidence autopsy photographs of the decedent when the defense did not contest the cause or time of death. Second, he contends that the trial court committed reversible error when it permitted a prosecution witness to testify that petitioner exchanged gang signs with other individuals without having established the proper foundation for such testimony. Specifically, petitioner claims that Jorge Martinez's testimony regarding petitioner's alleged gang membership and communication with gang signs was prejudicial. As set forth below, these claims are without merit because the evidence was properly admitted under New York law and, even if improperly admitted, the evidence and testimony were not so prejudicial as to deprive petitioner of a fair trial in accordance with his constitutional due process rights.

1. Legal Standard

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983); *see generally Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[H]abeas corpus relief does not lie for errors of state law." (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, he must "show that the error deprived [him] of a fundamentally fair trial." *Taylor*, 708 F.2d at 891; *see also Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'" (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988))). In other words, "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

To constitute a denial of due process under this standard, the erroneously admitted evidence must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Id.* (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) ); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (holding that evidence must be "crucial, critical, highly significant" (citation omitted)). Moreover, the court "must review the erroneously admitted evidence in light of the entire record before the jury." *Dunnigan*, 137 F.3d at 125 (citation and omitted). In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *See Wade v. Mantello*, 333 F.3d 51, 59 n.7 (2d Cir. 2003); *Davis v. Strack*, 270 F.3d 111, 123-24 (2d Cir. 2001). As set forth below, the Court has reviewed petitioner's objections regarding hearsay under this two-part test and concludes that the purported evidentiary errors do not warrant habeas relief.

2. Application

   a. The Autopsy Photographs

First, the trial court did not err by allowing the autopsy photographs to be admitted into evidence because they were admitted in accordance with New York law. Second, even assuming such error *arguendo*, the overwhelming evidence presented at trial made any such error insignificant, and, accordingly, admission of the photographs did not impinge petitioner's right to a fundamentally fair trial.

New York law generally allows admission of demonstrative evidence, such as photographs of deceased victims, so long as it tends "to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove other evidence offered or to be offered," such as testimony of a medical examiner. *People v. Pobliner*, 32 N.Y.2d 356, 369 (1973) (citations omitted). "When relevance is demonstrated, the question as to whether on balance the jury should be permitted to view such photographs is addressed to the sound discretion of the trial court." *People v. Stevens*, 76 N.Y.2d 833, 835 (1990). In fact, "[p]hotographs of homicide victims are admissible to demonstrate the position of the victim's body or the placement of the victim's wound or wounds." *People v. DeBerry*, 651 N.Y.S.2d 559, 560 (App. Div. 1996). Just because "a photograph may be gruesome does not preclude its admission where it is not offered for the sole purpose of arousing the emotions of the jury or to prejudice defendant." *People v. Dickerson*, 837 N.Y.S.2d 101, 108 (App. Div. 2007). Furthermore, "[t]he fact that other evidence may be available on the point is a factor but is not dispositive." *Stevens*, 76 N.Y.2d at 835; *see also People v. Reyes*, 855 N.Y.S.2d 160, 162 (App. Div. 2008) ("The mere fact that there was other available evidence with regard to these matters did not require the exclusion of the photographs."). Accordingly, "[p]hotographic evidence should be excluded only if its sole purpose is to arouse the emotions of the jury and to prejudice the defendant." *Pobliner*, 32 N.Y.2d at 370.

Here, the trial court did not err in admitting the autopsy photographs that showed the victim's face and removed lung after the murder. In fact, the photographs were necessary to help prove the disputed issue of petitioner's intent to kill, an element

required for a second-degree murder conviction under New York Penal Law § 125.25. *See People v. Wright*, 830 N.Y.S.2d 861, 864 (App. Div. 2007) (finding no reversible error because "only three of approximately 30 autopsy photographs were used and, showing the severity of the wound, they were probative on the issue of defendant's intent to kill"); *People v. Jones*, 843 N.Y.S.2d 880, 882 (App. Div. 2007) (affirming the lower court's decision to admit autopsy photographs because, among other reasons, they showed an "intent to kill"); *People v. Blanchard*, 718 N.Y.S.2d 722, 725 (App. Div. 2001) ("We cannot say that County Court abused its discretion in determining that the probative value of the photographs outweighed their potential for prejudice since their depiction of the nature and manner of the killings tended to establish a material element . . . namely, whether defendant intended to kill the victims."); *Flores v. Fischer*, No. CV-05-1970 (FB); 2006 WL 385317, at *4 (E.D.N.Y. Feb. 17, 2006) (finding that admission of autopsy photographs, including one showing a large opening in victim's head, did not violate petitioner's due process rights); *Franco v. Walsh*, No. 00 CIV. 8930AGSJCF, 2002 WL 596355, at *7-8 (S.D.N.Y. Apr. 17, 2002) (denying habeas claim where state court permitted the prosecutor to display severely injured victim to jury because "the extent of the victim's injuries was clearly relevant").

The autopsy photographs were also relevant to corroborate Dr. Sims-Childs' testimony. Specifically, Dr. Sims-Childs testified that Mr. Bethancourt-Lopez died from a "blunt impact injury" to the head resulting in multiple fractures to the face and skull, which were caused by "significant force." *See, e.g.*, *People v. Coleman*, 48 N.Y.S.3d 478, 480 (App. Div. 2010) (finding that an autopsy photograph of the victim's skull with the scalp removed was "relevant to help illustrate and corroborate the testimony of the medical examiner regarding the cause of death"); *People v. Simon*, 897 N.Y.S.2d 578, 580 (App. Div. 2010) ("The autopsy photograph was relevant to illustrate and corroborate the testimony of the Medical Examiner with respect to the cause of death."); *People v. Hayes*, 897 N.Y.S.2d 370, 371 (App. Div. 2010) ("The photographs were properly admitted in evidence to assist the jury in understanding the Medical Examiner's testimony concerning the extent of the victim's stab wound."). In fact, Dr. Sims-Childs also testified about a specific injury, contusions to the lung, that the victim suffered during petitioner's attack. Accordingly, "[t]he People were not bound to rely entirely on the testimony of the medical expert to prove this point and the photographs were admissible to elucidate and corroborate that testimony." *Stevens*, 76 N.Y.2d at 836. Thus, because the photographs were admitted into evidence for both proof of intent and to corroborate the medical examiner's testimony, the trial court properly admitted the photographs in accordance with New York state law.

Finally, given the overwhelming evidence of petitioner's guilt, these photographs (even if erroneously admitted) could not have had a significantly prejudicial effect on the jury's verdict. As discussed more fully *infra*, the surveillance footage depicting petitioner and his friends approaching the bar with weapons and then immediately fleeing the scene pursued by Officer Meyerback; Officer Meyerback's observation of the blood stains on petitioner's clothing; DNA analysis of the stains revealing it was the victim's blood; the blood pattern analysis; and the expert testimony of the medical examiner all overwhelmingly demonstrated petitioner's guilt, and the admission of the photographs did not deprive

petitioner of a fundamentally fair trial or impact the outcome.

In sum, the state court's evidentiary decision regarding the autopsy photographs was neither contrary to, nor an unreasonable application of, clearly established federal law, and petitioner's claim is without merit.

### b. Jorge Martinez's Testimony

Likewise, the trial court did not err in permitting Jorge Martinez to testify about petitioner's alleged MS-13 gang membership and subsequent communication with "gang signs." In any event, even assuming *arguendo* that it was an error to admit that testimony under state law, any such error was not prejudicial and does not amount to a constitutional violation warranting habeas relief.

At trial, Mr. Martinez testified as follows regarding petitioner's purported gang activity:

> Q. Now, I'm going to direct your attention again to that day, June 5th, 2011. In the early morning hours, did there come a time that there was an argument between two groups of people inside of the Fiesta Pool Hall that you saw?
>
> A. Yes.
>
> Q. And can you describe – tell the jury how the argument started.
>
> A. The – The argument started – Well, there was one group, the Mara, the MS, they were having discussion with another group that were not. I mean, they were just friends, that other group.
>
> Q. Just so we're clear, the first group you said, La Mara, is that MS – is that MS-13?
>
> A. Yes. LaMara.
> . . .
> Q. And just for the jury's edification, what is MS-13?
>
> A. A gang.
>
> Q. How did you know that that first group was MS-13?
>
> A. Because they're always making some kind of signs either between themselves or against other people, gang signs.
>
> Q. Have any of them ever said that they were MS-13?
>
> A. Yes.
> . . .
> Q. [F]irst of all, which group started the argument?
>
> A. MS.
>
> Q. And what was the argument about? When I say what was the argument about, what, if anything, did anyone from the MS-13 group say or do to anyone from the other group?
>
> A. That they're making like hand signs saying that that other group –
>
> MR. BROWN: Objection.
>
> THE COURT: Overruled. The witness may describe what he saw. And that's what the witness so far [has] done. . . . Sir, you've indicated that, quote, they were making hand signs. Is that true?

THE WITNESS: Yes.
. . .
Q. And did they say anything else? I'm talking about the MS-13 group.

A. Well, since I'm looking at everybody there, I mean, I saw the signs and then I saw that they were arguing with them, but I didn't hear what they said.

Q. And when you say "signs," could you just show with your hands to the jury what you're talking about.

A. They make a sign of the SM – I mean – an MS. I really don't know how they make the sign. I mean, I don't know how to do it.

Q. Was anyone from the second group making any signs with their hands?

A. No.

(T. 1239, 1241-42, 1251.)

With respect to this testimony, the trial court instructed the jury that:

> [t]he statement about alleged gang membership or an alleged membership in MS-13 is – it's not being offered for the truth, but simply to complete the narrative and for its affect on the state of mind of this witness.
> . . .
> Before we move on to the cross examination of Mr. Martinez, ladies and gentleman, you've heard mention of the defendant's alleged membership in a gang. You are to draw no inference, negative or otherwise, with respect to this testimony. If you choose, you may consider this testimony only as it relates to the completion of the narrative. You may not consider this testimony for any other purpose.

(T. 1249, 1275-76.)

On petitioner's direct appeal, the Second Department found that, "[c]ontrary to [petitioner's] contention, the Supreme Court providently exercised its discretion in admitting testimony relating to [petitioner's] alleged membership in a gang, since the probative value of that testimony outweighed any prejudice to the defendant." *Gonzales-Martinez*, 136 A.D.3d at 652 (citing *People v. Borrero*, 79 A.D.3d 767 (N.Y. App. Div. 2010); *People v. Jordan*, 74 A.D.3d 986 (N.Y. App. Div. 2010)). "The testimony was relevant to the issue of the defendant's motive, was inextricably interwoven into the narrative, and explained the relationships between the parties. Moreover, the Supreme Court alleviated any prejudice to the defendant by providing appropriate limiting instructions." *Id*. (citations omitted).

That decision was not erroneous under state law because, as the Second Department noted, "[e]vidence of [petitioner's] gang membership provides context to his motive to commit murder." *Sandoval v. Lee*, No. 14-CV-5187 (JMA), 2016 WL 2962205, at *6 (E.D.N.Y. May 20, 2016) (citing *Washington v. Artuz*, No. 07-CV-7769, 2013 WL 1285877, at *2, 13 (S.D.N.Y. Mar. 29, 2013) (finding that evidence of membership in rival gangs was "probative of [the petitioner's] motive for an otherwise inexplicable murder" because without that evidence, the record would indicate that a young man had been shot at random on the street); *Shannon v. Artuz*, 984 F. Supp. 807, 809-10 (S.D.N.Y. 1997) (affirming the trial court's decision to

permit testimony about the petitioner's gang membership because the evidence was "relevant to prove petitioner's motive for assisting in [a] murder" and also bolstered the prosecution's theory that the murder was "motivated by revenge and the [gang members'] desire to assert their dominance")). Thus, Mr. Martinez's testimony regarding the gang signs and the MS-13 explained to the jury what precipitated the dispute that led to petitioner's alleged criminal conduct.[3] *See id*.

Furthermore, even assuming *arguendo* that the trial court erroneously allowed Jorge Martinez's testimony about petitioner's alleged MS-13 gang membership and subsequent communication with "gang signs," that error does not amount to the denial of petitioner's right to a constitutionally fair trial. In fact, the trial court's prompt limiting instruction regarding Mr. Martinez's testimony mitigated the potential for prejudice, which, as mentioned above, was minimal given the overwhelming evidence of petitioner's guilt. Such a limiting instruction lessens the potential prejudice of a witness's testimony because it sufficiently clarifies the limited purpose for which the jury could consider this testimony. *See, e.g.*, *People v. Asai*, 888 N.Y.S.2d 617, 621 (App. Div. 2009); *People v. Doyle*, 852 N.Y.S.2d 433, 437 (App. Div. 2008) ("Additionally, [the] County Court gave proper and appropriate limiting instructions to the jury concerning the permissible uses of this evidence thus limiting its prejudicial effect."); *People v. James*, 797 N.Y.S 2d, 130 (App. Div. 2005) (finding the prejudicial effect of the admission of prior bad acts did not outweigh their probative value, "especially in light of the fact that the trial court properly charged the jury on how to use the prior act evidence in their deliberations"); *see also Wells v.. Brown*, No. 06–CV–857 (CBA), 2008 WL 2097612, at *7 (E.D.N.Y. May 15, 2008) (explaining, in context of a habeas petition involving a *Molineux* issue, that the state trial court's limiting instruction lessened the evidence's prejudicial effect).

Petitioner has failed to provide any basis to conclude that this limiting instruction was inadequate to relieve any potential prejudice. *See United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("As the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions.") (citing *Zafiro v. United States*, 506 U.S. 534, 540-41, (1993)); *United States v. Ebner*, 782 F.2d 1120, 1126 (2d Cir. 1986) ("Such limiting instructions are an accepted part of our present trial system . . . and consequently there is a presumption that juries will follow [them]." (citations omitted)).

Finally, as noted above, any prejudicial effect from the testimony regarding petitioner's MS-13 gang membership would not have impacted the outcome of the trial given the overwhelming evidence of petitioner's guilt, as discussed *infra*. Accordingly, the Court's review of the trial transcript reveals that the claimed errors did not have a "substantial and injurious effect" on the verdict, *Bricht v. Abrahamson*, 507 U.S. 619, 637 (1993), and leads the Court to conclude "beyond a reasonable doubt that the error[s] complained of did not contribute to the verdict obtained," *Chapman v. California*, 386 U.S. 18, 24 (1967). Accordingly, habeas relief on this evidentiary claim is also unwarranted.

---

[3] To the extent petitioner objects because Mr. Martinez was a lay witness, that objection is without merit because he was testifying about what he saw and heard (including individuals making "MS" signs with their hands).

B. Insufficiency of the Evidence Claim

Petitioner also argues that the prosecution failed to prove his guilt beyond a reasonable doubt and that his convictions were against the weight of the evidence. However, it is well established that a "weight of the evidence" claim is based on state law. *See, e.g.*, *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."). The Court cannot consider a purely state law claim on federal habeas review. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law . . . ."). Therefore, to the extent petitioner raises a weight of the evidence claim under state law, the Court cannot review it.

However, the Court will construe the petition as raising a federal claim that the evidence was insufficient to support the conviction, which does present a question of federal law. *See Einaugler v. Supreme Court of the State of N.Y.*, 109 F.3d 836, 839 (2d Cir. 1997) (stating that the Fourteenth Amendment requires "sufficient evidence for a jury to find that the prosecution proved the substantive elements of the crime as defined by state law" (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979))). As discussed below, any claim that the evidence at petitioner's trial was insufficient to support a finding of guilt beyond a reasonable doubt on each count is without merit.

1. Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well-established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler*, 109 F.3d at 840. As such, a "state criminal conviction will be upheld if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vassell v. McGinnis*, No. 04-CV-0856 (JG), 2004 WL 3088666, at *5 (E.D.N.Y. Dec. 22, 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) ("'[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2554[,] . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" (quoting *Jackson*, 443 U.S. at 324)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). Even when "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994). Thus, "[a] habeas court will not grant relief on a sufficiency claim unless the record is 'so totally devoid of evidentiary support that a due process issue is raised.'" *Sanford v. Burge*, 334 F. Supp. 2d 289, 303 (E.D.N.Y. 2004) (quoting *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994)).

In sum, a petitioner cannot prevail on a claim of legally insufficient evidence unless

he can show that, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Flowers v. Fisher*, 296 F. App'x 208, 210 (2d Cir. 2008) (quoting *Jackson*, 433 U.S. at 324). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

2. Application

Here, petitioner argues that his conviction was not based on legally sufficient evidence. (Pet. at 17.) The Second Department held that the legal sufficiency claim was "mostly unpreserved for appellate review." *People v. Gonzales-Martinez*, 136 A.D.3d 651, 651 (N.Y. App. Div. 2016). Further, when viewing the evidence in the light most favorable to the prosecution, the Second Department found that the evidence "was legally sufficient to prove the defendant's guilt beyond a reasonable doubt." *Id.* The court accorded "great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor," and, after conducting an independent review, held that "the verdict was not against the weight of the evidence." *Id.* This Court similarly concludes that the evidence was more than sufficient to prove petitioner's guilt beyond a reasonable doubt and raises no due process issues.

Here, in support of his insufficiency claim, petitioner argues that the testimony of Mr. Martinez changed from three individuals attacking the victims to seven. (Pet. at 16.) Further, petitioner argues that Mr. Martinez never made mention of the MS-13 gang or gang signals to the detectives on the night of the murder. (Pet. at 16.) Also, he claims that Mr. Velasquez's testimony about the statement, "You want to die, you sons of bitches," was subsequently undermined by Detective McLeer's testimony that Mr. Velasquez never told the detective about any such threat. (Pet. at 17.) Finally, petitioner calls into question Mr. Velasquez's written statements to the police because Mr. Velasquez failed to mention that one of the assailants wore a black shirt. (Pet. at 17.)

After careful review, the Court concludes that a rational trier of fact could have found that all the essential elements of petitioner's crimes were met for each count of conviction. First, regardless of whether Mr. Martinez saw three or seven attackers, the crime of gang assault occurs when one individual, accompanied by two or more individuals, causes serious physical injury. *See* N.Y. Penal Law § 120.07. Here, the surveillance footage shows the petitioner accompanied by two other individuals approaching the Fiesta Pool Hall, with what appear to be weapons. (T. 1779, 2445.) Furthermore, the surveillance footage also shows a group of five people, including petitioner, fleeing the scene of the crime. (T. 1721-27, 1745-46, 1766, 1779-81.)

Second, the crime of second-degree assault is committed when one person intentionally causes injury to another with a dangerous instrument. *See* N.Y. Penal Law § 120.05(2). Dangerous instrument means "any instrument, article or substance, including a 'vehicle' as that term is defined in this section, which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13). Here, the surveillance footage shows petitioner leaving the first attack, dropping an object as he walked. (T. 1766.) Furthermore, Mr. Orellana's medical records attributed his injuries to being struck in the head by a rock, which would be considered a

dangerous instrument under the statute. (T. 1979.)

Third, the crime of second-degree murder is committed when one person intentionally causes the death of another. *See* N.Y. Penal Law § 125.25. Here, the medical examiner testified that the decedent's injuries to the face and skull were caused by "significant force." (T. 1918.) Furthermore, the injuries were caused by multiple strikes from baseball bats and a metal pipe. (T. 1918.) Indeed, the blood stains on petitioner's jeans and the expert's analysis indicated that petitioner was in close proximity to the victims. (T. 2099-2111, 2249-81.) Moreover, these same blood stains on petitioner's clothes matched the victims' DNA profiles, which were also found on the weapons recovered from the scene. (T. 2099-2111.)

Fourth, the crime of first-degree assault is committed when one intentionally causes serious physical injury to another by means of a dangerous instrument or deadly weapon. *See* N.Y. Penal Law § 120.10(1). Serious physical injury means a "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10). Here, Mr. Garcia, the survivor of the second attack, suffered similar injuries to the decedent, Mr. Bethancourt-Lopez. In fact, Mr. Garcia suffered fractures to the facial bones and skull, contusions to the lungs, and lacerations and contusions to the face, which resulted in his time in a coma. (T. 1982, 1694.) Additionally, these injuries were also consistent with being struck by baseball bats and a pipe. (T. 1983.)

Fifth, the crime of attempted second-degree murder is committed when, "with intent to commit a crime, he engages in conduct which tends to effect the commission . . . ," of second-degree murder. N.Y. Penal Law § 110.03; *see also* N.Y. Penal Law § 125.25. Here, the surviving victim of the attack suffered injuries that certainly supported a rational juror finding that there was an intent to murder Mr. Garcia, although he survived. (T. 1982, 1694, 1909-18.)

Accordingly, the overwhelming evidence discussed *supra*, along with the cell phone records (T. 2025-31) and the weapons recovered at the scene (which appear on the surveillance footage) (T. 1455-57), taken in the light most favorable to the prosecution, was sufficient for a rational trier of fact to convict petitioner for these crimes. Discrepancies about a failure to mention the color of a shirt, gang membership, the use of gang signs, and threats made to the victims, are not enough to satisfy the heavy burden placed on petitioner in the context of a habeas petition. (Pet. at 16-17.)

In sum, as stated *supra*, when "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994). Accordingly, the discrepancies between Mr. Martinez's and Mr. Velasquez's testimonies are presumed to be decided by the jury in favor of the prosecution, to which this Court gives great deference. Thus, the Court finds that, viewing the evidence presented at trial most favorably to the prosecution, there was sufficient evidence for a rational trier of fact to convict petitioner for the crimes of conviction beyond a reasonable doubt. Petitioner's insufficient evidence claim is, therefore, denied.

C. Excessive Sentence Claim

Finally, petitioner argues that his aggregate sentence of 33 years to life of imprisonment with five years' post-release supervision is harsh and excessive and should be modified in the interest of justice. For the reasons set forth below, the Court finds no basis for habeas relief in connection with petitioner's sentence.

As a threshold matter, to the extent that petitioner relies on state law as a ground for an excessive sentence claim, such a claim is not cognizable on habeas review. *See, e.g.*, *Wilson v. Ercole*, No. 06-cv-553 (DLI), 2009 WL 792089, at *11 (E.D.N.Y. Mar. 23, 2009) ("On his direct appeal, petitioner . . . did not contend that this sentence violated his constitutional rights, but instead urged the Appellate Division to reduce the sentence under C.P.L. § 470.15(6)(b), which gives the state court broad plenary power to modify a sentence that is unduly harsh or severe, though legal. The Appellate Division declined, stating that 'the defendant's remaining contentions are without merit.' Petitioner now re-asserts this identical claim. Given that this claim rests exclusively on state law, the court may not review it under 28 U.S.C. § 2254(d)." (internal citations omitted)).

Insofar as petitioner raises a federal claim that his sentence was cruel and unusual punishment under the Eighth Amendment, the Court rejects such an argument. For the purpose of habeas review, "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Santiago v. Riley*, No. 92-cv-2302 (DRH), 1993 U.S. Dist. LEXIS 6990, at *11-12, 1993 WL 173625 (E.D.N.Y. May 14, 1993) ("Where the sentence imposed by a state trial judge is within the statutorily prescribed range, the constitution is not implicated and there is no federal question for habeas corpus review." (citation omitted)); *Underwood v. Kelly*, 692 F.Supp. 146, 152 (E.D.N.Y. 1988), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

Here, petitioner was convicted of five different crimes and was sentenced in aggregate to an imprisonment term of 33 years to life with five years' post-release supervision. Specifically, he received the following sentences: for murder in the second degree, a class A-1 felony, 20 years to life of incarceration; for attempted murder in the second degree, assault in the first degree, and gang assault in the first degree—all class B felonies—a determinate, concurrent sentence of ten years' incarceration with five years' post-release supervision; and finally, for assault in the second degree, a class D felony, a determinate sentence of three years' incarceration with three years' post-release supervision. *See* N.Y. Penal Law §§ 120.05(2), 120.07, 120.10(1), 125.25, 110.05(3)/125.25. An individual convicted of a class A-1 felony is subject to a minimum term of fifteen years' and a maximum term of life imprisonment, and when a sentence is indeterminate, the trial court has discretion to impose a term within that range. *See* N.Y. Penal Law § 70.00(2)(a), 70.00(3)(a)(i). Further, under New York law, a conviction of a class B felony may yield a determinate sentence of no more than 25 years' incarceration. *See* N.Y. Penal Law § 70.00(2)(b). Finally, for a class D felony conviction, a determinate sentence may not exceed seven years' incarceration. *See* N.Y. Penal Law § 70.00(2)(d).

Accordingly, the sentences on the individual counts, as well as the aggregate sentence imposed by the trial court of 33 years to life of imprisonment, are within the

statutory limits set forth by New York State law. *See* N.Y. Penal Law § 70.00. Because petitioner's sentence is within the statutorily-prescribed range, it raises no constitutional concerns, and, therefore, petitioner's habeas claim is without merit.[4]

### IV. CONCLUSION

In sum, the Court concludes that petitioner's claims are without merit and do not provide a basis for habeas relief in this case. Accordingly, this petition for a writ of habeas corpus is denied in its entirety, and because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 6, 2017
Central Islip, New York

\*\*\*

Petitioner is proceeding *pro se*. Respondent is represented by Thomas C. Costello, Assistant District Attorney, Suffolk County District Attorney's Office, 200 Center Drive, Riverhead, NY 11901.

---

[4] In any event, the Court finds no basis to conclude that petitioner's indeterminate sentence was grossly disproportionate to the crime committed so as to violate his Eighth Amendment rights given the nature of his criminal activity in this case.